**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA**

DAVID (DAWUD) TURNER,                          )
                                               )
    *Plaintiff*,                            )
                                               )
                                               )   CIVIL ACTION
    v.                                      )
                                               )
CITY OF PHILADELPHIA, KENNETH                  )   Case No._____
PIREE (EXECUTOR FOR THE ESTATE OF              )
JEFFREY PIREE (#638)), WALTER                  )
HOFFNER (#9001), ROBERT                        )   **COMPLAINT**
BALLENTINE (#9063), RICHARD BOVA               )   **JURY TRIAL DEMANDED**
(#9228), WALTER CAMPBELL, VICTOR               )
MARCONE, CHRISTOPHER STARR,                    )
                                               )
    *Defendants*.                           )

**INTRODUCTION**

1.       This matter concerns the misconduct of Philadelphia Police Department ("PPD") detectives who caused the wrongful prosecution, conviction, and 38-year imprisonment of Plaintiff David Turner for a murder he did not commit.

2.       On February 2, 1987, PPD detectives, with Defendant Jeffrey Piree in the lead, framed Turner for murder. Faced with a shooting with no eyewitness, the detectives manipulated and coerced the victim's girlfriend, Rosemary Morales, into falsely identifying Turner.

3.       Tragically, Detective Piree and his colleagues were successful in their efforts to frame Turner. He was convicted of murder in April 1988 and sentenced to life imprisonment.

4.        For decades, Turner fought his conviction. Finally, in post-conviction litigation, Turner obtained the full police and prosecution files related to his conviction. These files revealed that Defendant detectives had concealed critical impeachment evidence about  Morales, their only witness. In 2025, Morales recanted her entire testimony, confirming that she had not seen the

shooter, was high on drugs at the time, and that Defendant Officers manipulated her, including through threats of prosecution, to falsely identify Turner.

5.     Furthermore, by then, the Commonwealth had recognized that Defendant Piree had an established record of using unconstitutional tactics to secure false convictions. The suppressed records, combined with a string of exonerations linked to Defendant Piree's cases, confirmed such fundamental wrongdoing that the District Attorney of Philadelphia consented to post-conviction relief in 2025. After almost four decades of incarceration, Turner was exonerated, the criminal court vacated his conviction, and all charges against him were dropped on December 10, 2025.

6.     Turner's case is not an isolated occurrence and unconstitutional practices within the Philadelphia Police Department (PPD) were not unique to Detective Piree. On the contrary, at the time of Turner's arrest, the tactics employed by Defendant detectives in Turner's case – manipulating vulnerable witnesses to fabricate evidence, purposefully hiding evidence from the prosecution and defense, and failing to conduct proper investigations – reflected widespread police customs and practices of the PPD. These practices included fabricating witness statements through coercion, withholding evidence, improper use of confidential sources and informants, and failing to properly conduct and document investigations. Indeed, in recent years, convictions from the 1980s and 1990s have unraveled after the unconstitutional practices of the investigating officers came to light.

7.     Turner now seeks long overdue justice for the loss of his liberty and hardship he endured and continues to suffer from the actors that could and should have prevented it: the Defendant Officers and the Defendant City of Philadelphia.

## I.     JURISDICTION AND VENUE

8.     Plaintiff David Turner brings this action under 42 U.S.C. § 1983 and Pennsylvania

law to redress the Defendants' tortious conduct and their deprivation of his rights secured by the U.S. Constitution.

9.    This Court has jurisdiction over Plaintiff's federal claims under 28 U.S.C. § 1331 and supplemental jurisdiction over his state-law claims under 28 U.S.C. § 1367.

10.    Venue is proper under 28 U.S.C. § 1391(b) because Plaintiff lives in this judicial district and the events and omissions giving rise to his claims, including the investigation, prosecution, and trial resulting in Plaintiff's conviction, happened here.

## II.    PARTIES

11.    Plaintiff David (Dawud) Turner, of Philadelphia, was at all times relevant to this Complaint, a resident of Philadelphia, Pennsylvania.

12.    Defendant City of Philadelphia is a municipality in the Commonwealth of Pennsylvania and owns, operates, manages, directs, and controls the Philadelphia Police Department, which, at all relevant times, employed the below individual defendants. The City of Philadelphia is a person within the meaning of 42 U.S.C. § 1983 and is responsible for the policies and practices of the Philadelphia Police Department.

13.    Defendant Jeffrey Piree was, at all times relevant to this Complaint, a detective in the Philadelphia Police Department's Homicide Division. Kenneth Piree, the executor for the estate of Jeffrey Piree, deceased, is named as a Defendant in his capacity as Special Representative of Jeffrey Piree, as successor in interest and to defend this action on behalf of Defendant Piree.

14.    At all relevant times Defendants Walter Hoffner, Robert Ballentine, Richard Bova, Walter Campbell, Victor Marcone, and Christopher Starr were employees of the Philadelphia Police Department.

15.    Plaintiff sues these individuals in their individual capacities, acting under the color

3

of law and within the scope of their employment during the investigation of the February 2, 1987 shooting of Nelson Diaz.

## III.    FACTS

### A.  The Murder of Nelson Diaz and Interrogation of Morales

16.    Just after noon on February 2, 1987, Nelson Diaz was shot in the hallway of his first-floor residence at 426 W. York Street. The position of his body suggested he was running up the stairs between the second and third floors when he fell.

17.    Though the shots were heard by various neighbors from inside their apartments, none of them saw the shooter.

18.    Rosemary Morales, who was Nelson's girlfriend at the time, was in their apartment at the time of the shooting. At the time, Morales was only 19 years old, pregnant with Diaz's son, and struggled with addiction. When the shooting occurred, Morales was getting high in her kitchen. She heard the shots but did not witness the shooting.

19.    Responding officers interviewed Morales at the scene. She told them that she heard shots from inside her apartment; when she came out she found Diaz lying on the landing between the second and third floors, having been shot, and saw a man leaving the building. To all the officers she spoke to, Morales made clear she had never seen this person before.

20.    The police transported Morales to the police station to question her further. Still high from narcotics and in shock from seeing her boyfriend laying on the ground shot to death, Morales was in a very vulnerable state. Knowing that Morales was in such a vulnerable state, Defendants Piree and Ballentine nevertheless held her for more than 12 hours in order to coerce her to falsely identify Plaintiff.

21.    Once at the station, Detectives Piree and Ballentine, and Lieutenant Marcone questioned her, with Piree in the lead. Despite having no basis to do so, they threatened to charge

4

Morales with Diaz's murder if she did not cooperate with their investigation. Morales, who had been cooperating by providing a truthful account of exactly what she saw, was frightened by the Defendants' threat.

22.    Defendants spent the next 12 hours working on Morales to get her to tell a false story. Eventually, the Defendants' threats and coercive tactics succeeded. The Defendants coerced Morales into providing a statement that falsely identified Turner, the Plaintiff here, as the man she saw fleeing from the scene. Detectives also coerced Morales into falsely claiming that she heard her boyfriend and Turner arguing outside her door shortly before hearing the shots.

23.    There were several problems with the false identification. The man Morales viewed at the scene was a stranger to her, but Morales knew Turner. Moreover, Turner did not remotely match the description Morales provided. The police recorded Morales's initial description before she was coerced by Defendants. She described the man as being clean-shaven, with rimmed glasses and grey specks in his hair. Turner, however, had a mustache and beard, did not wear glasses, and at 29 years old, did not have grey specks in his hair. These discrepancies were known to Defendants at the time of Turner's arrest.

24.    Turner, who lived in a different part of the city, had nothing to do with the murder. No other witnesses or physical evidence ever connected him to the crime.

**B. Defendant Officers Rely on the Fabricated Identifications and Suppositions to Arrest Turner**

25.    Turner was later confronted by Detectives Piree and Campbell while out on the street nearby. He did not know why he was being arrested, but he cooperated with the arrest and questioning and followed them to the station. Despite being questioned for hours by Detectives Piree, Hoffner, and Bova, Turner never admitted to the shooting and maintained his innocence.

26.    While he was being questioned, Detective Bova extracted Turner's boots, which

the detectives claimed had a suspicious material on them they believed would be blood. This was false. There was no suspicious substance on Turner's boots. Nevertheless, the suggestion formed part of the basis for Turner's arrest warrant. Forensic testing of the boots conducted later proved they did not have any blood on them.

### C. Plaintiff is Charged and Later Wrongfully Convicted Based on the False and Fabricated Evidence

27.    At Turner's Preliminary Hearing, which was delayed until February 26, 1987 because Morales initially refused to testify, Morales returned to her original and true account: that she had not seen the shooter and, in any event, had been too high to remember anything. In response, the prosecution submitted the statement coerced by Defendants into evidence.

28.    At trial, however, Morales repeated the false story the detectives coerced her to say during her interrogation. Testifying that she had lied at the Preliminary Hearing, she told the jury the story fabricated by the detectives: that she heard Diaz and someone she claimed was Turner arguing about a drug sale outside her apartment. After she heard gunshots, she opened the door and saw a man she claimed was Turner running out of the building. He turned around, looked at her, and threatened her.

29.    Based only on Morales' false testimony, Turner was convicted on April 8, 1988 of second-degree murder.

### D. Disclosure of Suppressed Information and Recognition of Defendant Piree's Unconstitutional Tactics Lead to Vacatur of Turner's Conviction

30.    Turner has always maintained his innocence. He refused to plead guilty, even when offered a deal of 5-10 years during jury deliberations. He never confessed and, after his conviction, tirelessly pursued post-conviction relief.

31.    Turner's post-trial motions and direct appeal were all unsuccessful, as well as his

attempts to request habeas relief and initial post-conviction petitions.

32. It was not until May 2023, when the Commonwealth disclosed the Philadelphia Police Department's Homicide File and the District Attorney's Office File to Turner that his case took a different turn.

33. The file revealed that, after Morales identified Turner during her interrogation, she descended into a severe mental health crisis that, had it been known to the jury at the time of Turner's trial, would have fundamentally undermined the case against Turner.

34. The withheld file showed that, after Turner's arrest, Detectives Hoffner and Campbell took Morales back to her apartment at 426 W. York Street at 1:30am. From there, they lost track of her. When Morales failed to appear for the preliminary hearing, Detectives Hoffner and Starr went to her apartment. They found she had moved out, leaving a 4-page suicide note addressed to her mother. On February 12, 1987, they found her staying at a friend's house. She was charged with witness absconding and arrested.

35. After realizing her state of mind, Detective Hoffner circulated an internal memo to the rest of the PPD indicating Morales would be held on suicide watch and should be treated accordingly. She was held until the rescheduled Preliminary Hearing on February 25, 1987 and was given immunity for her absconding charges in exchange for testifying. This information about Morales's mental health, her charge of witness absconding, and her immunity deal, was unknown to Plaintiff and his counsel until post-conviction proceedings unearthed it.

36. Turner, through counsel, submitted a Petition for Post Conviction Relief on April 29, 2024. The Commonwealth did not oppose the petition, stating that "If the jury, already struggling to reach a conviction, had known Morales suffered from mental illness that rendered her an unreliable narrator of events and vulnerable to coercion, there is a reasonable probability of

7

a different outcome. And confidence in the verdict is further undermined by recent disclosures regarding Detective Piree's history of improper conduct and failure to conduct thorough investigations." Dec. 8, 2025 Commw. Resp. at 51, *Commonwealth v. David Turner*, CP-51-CR-0304121-1987.

37.    On December 10, 2025, the State moved to *nolle prosequi* the charges, and the Court dismissed all charges against Turner.

38.    At the time of his exoneration, Turner had been fighting the false charges against him for more than half of his life. His suffering did not end with his release from prison. Defendant Officers' misconduct has severely and irreparably hindered Turner's ability to build a life of avocations, vocations, prosperity, and community; he lost valuable years with family members who passed away during his time of incarceration. Most fundamentally, the ability to live his life as an autonomous human being was stripped from him. This loss has caused Turner extreme physical and psychological pain and suffering, humiliation, fear, anxiety, deep depression, despair, rage, and other physical and psychological effects.

### E. The Philadelphia Police Department's Policy and Practice of Conducting Flawed Investigations and Framing Innocent Persons

39.    Turner is just one victim in the City of Philadelphia's long history of conducting profoundly flawed criminal investigations.

40.    Most specifically, Detective Piree, the lead detective in the false conviction of Turner, now has a documented history of misconduct and several recent exonerations have shed light on his tactics. False convictions tied to Detective Piree's investigations include:

    a. Gerald James, Anthony Johnson, and Curtis Manning: In response to a newly filed petition for post-conviction relief for three individuals accused of a 1986 murder investigated by Detective Piree, the Commonwealth consented to relief

citing the degree to which the verdict had depended on Detective Piree's testimony. No eyewitnesses tied the three men to the crime; instead, the case had rested on the defendants' girlfriends' statements that the men had implicated themselves. All three girlfriends recanted, two before trial and one subsequently, and said these statements had been coerced. On June 2, 2026, the Commonwealth submitted that "[t]he after-discovered evidence of Detective Piree's misconduct in other cases would have placed the girlfriends' accusations in a different light. With Detective Piree's testimony cast into grave doubt, the remaining evidence of Petitioners' guilt is not strong enough to support their convictions." *See* Commonwealth's Answer to Petition for Post Conviction Relief, filed June 2, 2026, at p.2, *Commonwealth of Pennsylvania v. Gerald James*, *Anthony Johnson*, *Curtis Manning*, CP-51-CR-0316761(2)(3)-1987 (pending PCRA petition seeking vacatur of the convictions of three men for a 1986 murder that was investigated by Det. Piree).

b. Chester Hollman: Two key witnesses in the investigation of the 1991 murder of a University of Pennsylvania student later claimed that they were threatened and coerced into implicating Hollman by Detective Piree. One was a homeless drug user with a history of schizophrenia, Andre Dawkins. Dawkins recanted in 2001, saying he was too high to remember seeing anything. He further stated that in the months leading up to Hollman's trial, Detective Piree visited several times to give him cash. Detective Piree and others told the other witness, Hollman's friend, that Hollman had already confessed and that she would be charged unless she also implicated him. This case settled pre-filing for $9.8

9

million, at the time the largest in Philadelphia history. *See* The National Registry of Exonerations, Chester Hollman III (available at https://exonerationregistry.org/cases/12684).

c.  Clayton Thomas: After viewing three photo arrays without identifying the shooter in a 1994 murder, a witness was told by the detectives to look "real good" at two photos in particular; these were Clayton Thomas and his co-defendant. Another witness testified that Detective Piree threatened to charge him with murder unless he identified the co-defendants. Thomas's conviction was ultimately overturned because it rested on the faulty identifications procured by Detective Piree. *Thomas v. Varner*, 2004 WL 1198256 (E.D.P.A. 2004) *affirmed Thomas v. Varner*, 428 F.3d 491 (3d Cir. 2005).

d.  John Miller: Detective Piree and Detective Bova, also a Defendant here, were among the officers responsible for Miller's wrongful 1998 murder conviction. The only witness, David Williams, recanted at the preliminary hearing and again at his trial, and later even admitted to the killing; nevertheless, Miller was convicted. He was exonerated in 2019 after a federal judge concluded that detectives had hid information that showed that Williams was not credible. *Miller v. District Attorney for the Cnty of Phila.*, 2:12-CV-0742 (AB) (E.D.P.A. July 1, 2019) (available at https://www.govinfo.gov/content/pkg/USCOURTS-paed-2_12-cv-00742/pdf/USCOURTS-paed-2_12-cv-00742-0.pdf).

e.  Donald Outlaw: A 2000 shooting went unsolved for nine months. Detective Piree and his fellow detectives coerced four witnesses to falsely implicate Outlaw in the crime. Later, it was determined that these detectives had

10

suppressed information about alternative suspects, including a confession, and the fact that one of the trial witnesses had been promised incentives in order to implicate Outlaw. In January 2019, Outlaw's conviction was overturned based in part on the detectives' suppression of exculpatory evidence. The National Registry of Exonerations, Donald Outlaw (available at https://exonerationregistry.org/cases/12965).

41.    Cases seeking exonerations of individuals convicted as a result of Detective Piree's coercive tactics are still coming to light. *See, e.g.*, *id.* (*Commonwealth v. James*, *Johnson*, *Manning*, CP-51-CR-0316761(2)(3)-1987 (pending PCRA petition seeking vacatur of the convictions of three men for a 1986 murder that was investigated by Det. Piree)).

42.    Detective Piree, though egregious in his tactics, was not alone. His unconstitutional actions occurred along a backdrop of high-profile scandals ranging from organized crime among PPD leaders to coercive tactics by its detectives and officers. At the time of Defendant Officers' investigation into this 1987 shooting, the City of Philadelphia had a policy and practice of fabricating witness statements through coercion, withholding of evidence, improper use of confidential sources and informants, improper conduct in and documentation of investigations, and failing to supervise the detectives responsible for the misconduct.

43.    These widespread practices were in effect since at least the 1970s and known to the City and its policy makers. The 1980s and 1990s brought arrests of high-level officers, the creation of a city task force to address the PPD's declining reputation, as well as a slew of newspaper articles, government investigations, complaints from lawyers and civilians, prior litigation and internal police investigations.

11

44.     As early as 1977, the *Philadelphia Inquirer* published an article describing a pattern of coercive interrogations of homicide suspects and witnesses in the PPD. The study conducted by the *Philadelphia Inquirer* showed that detectives, in beating or coercing suspects and later denying it under oath, had come to accept breaking the law as part of their job.

45.     This reporting continued through the 1980s and 1990s. In 1984, *The New York Times* reported on the convictions of the Deputy Commissioner and Chief Inspector of the PPD for extorting gambling operators, bringing "to 14 the number of convictions resulting from an inquiry that begin in 1981 when the operator of a massage parlor went to the F.B.I. with an extortion complaint against police officials."  "High Police Officers Convicted in Philadelphia," *The New York Times*, August 11, 1984, *available at* https://www.nytimes.com/1984/08/11/us/high-police-officers-convicted-in-philadelphia.html (high ranking Philadelphia police officers were convicted of conspiracy, racketeering and extortion). And in 1995, *The New York Times* reported on "a band of five renegade officers who haunted . . . [a] predominantly poor and black North Philadelphia neighborhood, beating, robbing, lying and planting phony evidence." *See* "Philadelphia Shaken by Criminal Police Officers," *The New York Times*, August 28, 1995 (actions of five police officers caused at least 1,400 drug-related cases to come under review, as well as several murder convictions).

46.     The unconstitutional practices of the PPD were so widespread that the federal courts intervened to enjoin PPD's unconstitutional practices. *See Cliett v. City of Philadelphia*, 85-cv-1846 (E.D.P.A. 1985) (consent decree arising out of the unconstitutionality of "Operation Cold Turkey," during which 1,500 individuals were unlawfully subjected to search and arrest); *Spring Garden United Neighbors v. City of Philadelphia*, 614 F.Supp. 1350 (E.D.P.A. 1985) (enjoining police sweep of Latinos in Spring Garden area in the aftermath of a shooting of a police officer);

*Arrington v. City of Philadelphia*, 88-cv-2264 (E.D.P.A. 1988) (enjoining the stop and searches of young African-American males during investigation of "Center City Stalker").

47.     To address the declining reputation of its police force, the City of Philadelphia convened the Philadelphia Police Study Task Force in 1986 to address the scandals and loss of faith of the community, months before Turner's wrongful arrest. In its 1987 publication, the Task Force characterized the PPD during this time as "unfocused, unmanaged, under-trained, under-equipped and unaccountable." *See* 1987, "Philadelphia and Its Police: Toward a New Partnership -- A Report by the Philadelphia Police Study Task Force," *available at* https://www.ojp.gov/ncjrs/virtual-library/abstracts/philadelphia-and-its-police-toward-new-partnership-report**.**

48.     But the misconduct continued into the 1990s, during which various scandals emerged. One was the so-called "Sex for Lies" scandal in which witnesses alleged that the police promised them sexual rendezvous in exchange for cooperation and confessions in murder investigations. Several victims of this scandal are included in the list of wrongful convictions below.

49.     The 1990s also brought the 39th District Corruption Scandal ("Scandal"). That Scandal involved widespread misconduct, which went unchecked and uncorrected. By 1997, eight PPD officers pled guilty to corruption charges, including framing, robbing, and beating suspects, and perjuring themselves in court. The officers involved in the Scandal fabricated evidence, withheld evidence, used coercive interrogation practices, and made false allegations of criminal conduct. As a result of this Scandal and the investigation into it, approximately 170 convictions were overturned and the City paid millions of dollars to settle cases filed by people who were wrongfully accused and imprisoned.

50.     Despite the wealth of evidence regarding unconstitutional and corrupt practices, the City of Philadelphia failed to enact meaningful disciplinary systems for misconduct or to implement adequate training procedures. And so, in 1996, the City of Philadelphia was required, as part of a settlement agreement in *NAACP, et al. v. City of Philadelphia*, No. 96-cv-6045 (E.D.P.A.) to implement policy and training initiatives to ensure that police officers abide by the restrictions on their investigative powers under the U.S. Constitution. As part of that agreement, the parties agreed that the City would appoint an Integrity and Accountability Office ("IAO") to assess and monitor the City's compliance with the agreement.

51.     In the period from 1997-2003, the IAO issued three reports on the disciplinary system of the PPD. The reports described excessive and chronic delays in resolving disciplinary complaints; lack of consistent, rational, and meaningful actions, and failure to discipline substantial numbers of officers who were found to have engaged in misconduct. While the final report noted some improvements in the PPD's internal affairs mechanism, it ultimately concluded that the disciplinary system remained fundamentally ineffective, inadequate, and unpredictable. Issued in 2003, it concluded that the PPD was "simply not interested in achieving true reform." Two years later, the IAO was shut down.

52.     Notwithstanding its knowledge of the policies, patterns and customs of misconduct in conducting criminal investigations as described above, the City and its policymakers did nothing to change course. The clearest and most egregious evidence is the mounting list of wrongful convictions and the individuals who lost decades of their lives.  These include:

    a.  Arthur Lester: Lester falsely confessed to the murder of Ronald Pope after PPD officers held him for more approximately 12 hours and promised him sexual gratification. The case was investigated by Detectives Larry Gerrard and Ernest

Gilbert. He was released in 1990 after the misconduct became known. *Comm. v. Lester*, 392 Pa. Super. 66, 572 A.2d 694 (1990) (available at https://law.justia.com/cases/pennsylvania/supreme-court/1990/392-pa-super-66-0.html).

b. Andre Harvey: Harvey was one of three men convicted of the 1982 shooting of Fred Rainy and was sentenced to life without parole. He served 41 years in prison until the District Attorney's Office agreed to vacate the conviction, conceding that the police had improperly withheld evidence of two alternate suspects. His case was investigated by Detectives Gerrard and Gilbert. *See* "Another Philly 'sex for lies' conviction has been overturned, freeing a man after 41 years," *The Philadelphia Inquirer*, October 9, 2024 (available at https://www.inquirer.com/crime/sex-for-lies-philadelphia-andre-harvey-conviction-overturned-20241009.html#loaded).

c. Russell Williams: Williams was Harvey's co-defendant, who plead guilty to the 1982 shooting of Fred Rainy and was released for the same reasons. He also served 41 years in prison. *See* "Fourth man released in Philadelphia in review of 'sex for lies' scheme in 1980s homicide unit," WHYY, December 9, 2024 (available at https://whyy.org/articles/philadelphia-sex-for-lies-scheme-1980s-homicide-unit-fourth-man-released/).

d. Willie Stokes: Stokes was convicted in 1984 of the 1980 shooting of Leslie Campbell and served 37 years in prison. The only witness against him, Franklin Lee, testified at the preliminary hearing that Stokes had admitted to killing Campbell. Lee recanted his preliminary hearing testimony at trial. He later

revealed that his statement that Stokes had confessed was given in exchange for sex and drugs. His case was investigated by Detectives Gerrard and Gilbert. *See* National Registry of Exonerations, Willie Stokes (available at https://exonerationregistry.org/cases/13148); "Philly DA drops 37-year-old murder case tainted by 'sex for lies' scheme," *Philadelphia Inquirer*, January 27, 2022 (available at https://www.inquirer.com/news/willie-stokes-exonerated-philadelphia-sex-for-lies-homicide-20220127.html).

e.  Antonio Martinez: Martinez was convicted of the 1985 murders of Hector and Luis Camacho. After 30 years of wrongful imprisonment, he was released after the Philadelphia District Attorney's Office stated that "his trial was infected by serious official misconduct." "Philly man, exonerated at 73, faced 'stunning violation of constitutional rights,' lawyers say," *Philadelphia Inquirer*, October 23, 2020 (available at https://www.inquirer.com/news/philadelphia-exoneration-da-ciu-patricia-cummings-antonio-martinez-wrongful-conviction-20201023.html). This included the failure to investigate alternate suspects that were identified by several eyewitnesses. *See* National Registry of Exonerations, Antonio Martinez (available at https://exonerationregistry.org/cases/12936).

f.  Walter Ogrod: Ogrod was sentenced to death for the murder of a four-year-old girl, based entirely on a "confession" Ogrod gave to PPD Officer Walter Devlin. Ogrod had driven all night and not been to bed in 36 hours when Detective Devlin went to work. According to the PPD, Ogrod burst into tears and gave a 16-page confession. Ogrod claimed that he was interrogated for hours by detectives; he finally broke from lack of sleep and began to believe what the

16

detectives fed him. After hearing Ogrod's testimony, 11 of 12 jurors voted to acquit before a mistrial was declared. At a retrial, with the aid of a notorious jailhouse informant, the state convicted Ogrod of capital murder. After DNA evidence proved that he did not commit the crime, Ogrod was released after 20 years on death row in 2020.

## DAMAGES

48.    The unlawful, intentional, willful, deliberately indifferent, and reckless acts and omissions of the individual Defendants and the City of Philadelphia caused Turner to be improperly arrested and imprisoned, unfairly tried, wrongfully convicted, and forced to serve over 38 years in prison for a crime he did not commit.

49.    As a direct result of Defendants' conduct and omissions, Turner sustained injuries and damages, including loss of freedom for 38 years, loss of his youth, pain and suffering, mental anguish, emotional distress, degradation, permanent loss of natural psychological development, and restrictions on all forms of personal freedom, including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, athletic opportunity, personal fulfillment, sexual activity, family relations, enjoyment, and freedom of speech and expression.

50.    As a direct result of Defendants' conduct and omissions, Turner was deprived of his family relationships, including with several close family members who passed away during his period of incarceration.

51.    As a direct result of Defendants' conduct and omissions, Turner sustained economic injuries and damages, including loss of income and loss of career opportunities.

52.    As a direct result of Defendants' conduct and omissions, Turner sustained physical injuries, including physical pain and suffering, personal injuries, physical illness, and inadequate

17

medical care.

## IV.    CAUSES OF ACTION

### COUNT I
### 42 U.S.C. § 1983 – Violation Due Process – Fabrication of Evidence
### (Fourteenth Amendment)

53.    Plaintiff incorporates each paragraph of this complaint as if fully restated here.

54.    As described in detail above, Defendant Officers, while acting individually, jointly, and in conspiracy with each other, and under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to a fair trial and his right not to be wrongfully convicted and imprisoned.

55.    In the manner described above, the Defendant Officers fabricated witness statements falsely implicating Plaintiff in the crime. This fabricated evidence was memorialized in police reports, adding to this deliberate deception.

56.    The Defendant Officers knew this evidence was false.

57.    The Defendant Officers obtained Plaintiff's conviction using this false evidence, and they failed to correct fabricated evidence they knew was false when it was used against Plaintiff during his criminal case.

### COUNT II
### 42 U.S.C. § 1983 – Due Process – Withholding of Exculpatory Evidence
### (Fourteenth Amendment)

58.    In addition, the Defendant Officers, individually, jointly, and/or in concert and in conspiracy, deliberately withheld exculpatory evidence from state prosecutors, Plaintiff, and Plaintiff's criminal defense attorneys, including evidence that the Defendant Officers had manufactured false identifications of Plaintiff, thereby misleading and misdirecting the criminal

prosecution of Plaintiff. In addition, Defendant Officers, individually, jointly, and/or in concert and in conspiracy, deliberately withheld impeachment evidence about the prosecution's main and only witness from state prosecutors, Plaintiff, and Plaintiff's criminal defense attorneys, which would have affected the outcome of the trial. In addition, the Defendant Officers concealed, fabricated, and destroyed other evidence not yet known to Plaintiff.

59.    The Defendant Officers' misconduct caused Plaintiff's unjust and wrongful criminal prosecution and deprivation of liberty, violating his right under the Fourteenth Amendment to a fair trial.

60.    Absent the Defendant Officers' misconduct, Plaintiff's prosecution could not and would not have been pursued.

61.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally and in total disregard of the truth and Plaintiff's clear innocence.

62.    As a result of the Defendant Officers' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, forced and involuntary prison labor, and other grievous and continuing injuries and damages as set forth above.

63.    As described in Count V below, Plaintiff's injuries were caused by the policies, practices, and customs of Defendant City of Philadelphia in that employees and agents of the City regularly failed to disclose exculpatory evidence to criminal defendants, fabricated false evidence implicating individuals in criminal conduct, elicited false and coerced witness testimony, pursued wrongful convictions through profoundly flawed investigations, and otherwise violated due process in a manner similar to that alleged here.

64.    The above-described widespread practices were so well-settled as to constitute de

19

facto policy of the City of Philadelphia and were allowed to exist and flourish because municipal policymakers with authority over the City's policies exhibited deliberate indifference to the problem, thereby effectively ratifying the policy.

65.    The widespread practices described in the preceding paragraphs were also allowed to flourish because the City of Philadelphia declined to implement sufficient training and any legitimate mechanism for oversight or punishment of officers and agents who withheld material evidence, fabricated false evidence and witness testimony, and pursued wrongful convictions.

## COUNT III
### 42 U.S.C. § 1983 Malicious Prosecution and Unlawful Detention

66.    Each paragraph of this Complaint is incorporated as if restated fully herein.

67.    In the manner described more fully above, Defendant Officers, while acting as investigators, individually, jointly, and in conspiracy with each other, accused Plaintiff of criminal activity and exerted influence to initiate, continue, and perpetuate judicial proceedings against Plaintiff without any probable cause for doing so and in spite of the fact that they knew Plaintiff was innocent. The Defendant Officers further continued to perpetuate their misconduct during Plaintiff's trial.

68.    In doing so, Defendant Officers caused Plaintiff to be unreasonably seized without probable cause and deprived of his liberty, in violation of Plaintiff's rights secured by the Fourth and Fourteenth Amendments.

69.    The false judicial proceedings against Plaintiff were instituted and continued maliciously by the Defendant Officers, resulting in injury.

70.    Defendant Officers deprived Plaintiff of fair state criminal proceedings, including the chance to defend himself during those proceedings, resulting in a deprivation of his liberty.

71.     In addition, Defendant Officers subjected Plaintiff to arbitrary governmental action that shocks the conscience in that Plaintiff was deliberately and intentionally framed for a crime of which he was totally innocent. This was accomplished through Defendant Officers' fabrication and suppression of evidence.

72.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with reckless and deliberate indifference to the rights of others, and with total disregard of the truth and of Plaintiff's clear innocence.

73.     The Defendant Officers' actions were taken under color of law and within the scope of their employment.

74.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice and willful indifference to Plaintiff's clearly established constitutional rights.

**75.**     The misconduct described in this Count by the Defendant Officers was undertaken pursuant to the policy and practice of the City of Philadelphia, in the manner more fully described above and in Count V below.

## COUNT IV
### Conspiracy to Violate Constitutional Rights

76.     Each paragraph of this Complaint is incorporated as if restated fully herein.

77.     After the February 1987 shooting, the Defendant Officers, acting within the scope of their employment and under color of law, agreed among themselves and with other individuals to act in concert in order to deprive Plaintiff of his constitutional rights, including his rights to due process and to a fair trial, all as described in the various paragraphs of this Complaint.

78.     Additionally, before and after Plaintiff's conviction, the Defendant Officers further conspired to deprive Plaintiff of exculpatory information to which he was lawfully entitled and

21

which would have led either to his not being charged, his acquittal, or his more timely exoneration.

79.    In this manner, the Defendant Officers, acting in concert with other unknown co-conspirators, conspired by concerted action to accomplish an unlawful purpose by unlawful means.

80.    In furtherance of the conspiracy, each of the co-conspirators engaged in and facilitated numerous overt acts, including but not limited to those set forth above—such as fabricating evidence, withholding exculpatory evidence, and committing perjury during hearings and trials—and was an otherwise willful participant in joint activity.

81.    As a direct and proximate result of the illicit prior agreement and actions in furtherance of the conspiracy referenced above, Plaintiff's rights were violated, and he suffered injuries, including but not limited to loss of liberty, psychological injury, and emotional distress.

82.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice and willful indifference to Plaintiffs' clearly established constitutional rights.

83.    The misconduct described in this Count by the Defendant Officers was undertaken pursuant to the policy and practice of the City of Philadelphia, in the manner more fully described above and in Count V below.

## Count V – 42 U.S.C. § 1983
### *Monell* Policy Claims (Against the City of Philadelphia)

84.    Each paragraph of this Complaint is incorporated as if restated fully herein.

85.    The actions of all the Defendants were undertaken pursuant to policies and practices of the City of Philadelphia, described above, which were ratified by policymakers with final policymaking authority. These policies and practices included the failure to adequately train, supervise, and discipline officers who engaged in the alleged constitutional violations, as

22

set forth in greater detail above. The policies and practices also included the failure to conduct proper investigations, including the failure to properly document the investigation, and conduct and report on witness interviews. The policies and practices also include the failure to turn over exculpatory evidence and to rely on fabricated evidence, including fabricated police reports.

86.     The policies and practices described in this Count were maintained and implemented by the City of Philadelphia with deliberate indifference to Plaintiff's constitutional rights.

87.     As a direct and proximate result of the City of Philadelphia's actions, Plaintiff's constitutional rights were violated and he suffered injuries and damages, as set forth in this Complaint.

88.     The City of Philadelphia is therefore liable for the misconduct committed by the Officer Defendants.

## COUNT VI
### State Law – Malicious Prosecution

89.     Each paragraph of this Complaint is incorporated as if restated fully herein.

90.     The Defendant Officers accused Plaintiff of criminal activity knowing those accusations to be without probable cause, and they made statements to prosecutors with the intent of exerting influence and to institute and continue the judicial proceedings.

91.     The Defendant Officers caused Plaintiff to be improperly subjected to judicial proceedings for which there was no probable cause, resulting in injury.

92.     The Defendant Officers fabricated evidence and withheld exculpatory evidence that would have demonstrated Plaintiff's absolute innocence. The Defendant Officers were aware that, as described more fully above, no true or reliable evidence implicated Plaintiff in any crime whatsoever.

23

93. The misconduct described in this Count was undertaken intentionally, with malice, and reckless indifference to the rights of others.

94. On December 10, 2025, the prosecution terminated in Plaintiff's favor when his conviction and sentence were vacated by Judge Jennifer Schultz of the Court of Common Pleas of Philadelphia County, Criminal Division.

95. As a direct and proximate result of this misconduct, Plaintiff sustained, and continues to sustain, injuries as set forth above, including loss of liberty, physical sickness and injury, and psychological and emotional distress.

## COUNT VII: State Law – IIED

96. The acts and conduct of the Defendant Officers as set forth above were extreme and outrageous. The Defendant Officers' actions were rooted in an abuse of power or authority, and they were undertaken with intent to cause, or were in reckless disregard of the probability that their conduct would cause, severe emotional distress to Plaintiff, as is more fully alleged above. As a direct and proximate result of the Defendant Officers' actions, Plaintiff suffered and continues to suffer physical injuries, and psychological and emotional distress.

## COUNT VIII: State Law Claim
## Civil Conspiracy (Against Defendant Officers)

97. Each paragraph of this Complaint is incorporated as if restated fully herein.

98. As described more fully in the preceding paragraphs, the Defendant Officers, acting in concert with each other and unknown co-conspirators, conspired by concerted action to accomplish an unlawful purpose by unlawful means.

99. In furtherance of the conspiracy, the Defendant Officers committed overt acts and were otherwise willful participants in joint activity including but not limited to the malicious prosecution of Plaintiff and the intentional infliction of emotional distress upon him.

24

100.    The misconduct described in this Count was undertaken intentionally, with malice, willfulness, and reckless indifference to the rights of others.

101.    As a direct and proximate result of the Defendant Officers' conspiracy, Plaintiff suffered damages, including physical sickness and injury, and psychological and emotional distress, as is more fully alleged above.

### COUNT IX: State Law - Indemnification

102.    Each paragraph of this Complaint is incorporated as if restated fully herein.

103.    Pennsylvania law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

104.    The Defendant Officers are or were employees of the City of Philadelphia, who acted within the scope of their employment in committing the misconduct described herein.

WHEREFORE, Plaintiff David Turner respectfully requests this Court enter a judgment in his favor and against Defendants CITY OF PHILADELPHIA, KENNETH PIREE (EXECUTOR FOR THE ESTATE OF JEFFREY PIREE (#638), WALTER HOFFNER, WALTER CAMPBELL, ROBERT BALLENTINE, RICHARD BOVA, CHRISTOPHER STARR, and VICTOR MARCONE awarding compensatory damages, attorneys' fees, and costs against each defendant, punitive damages against each individual defendant, pre- and post-judgment interest, and any other relief the Court deems just and appropriate.

### JURY DEMAND

Plaintiff David Turner hereby demands a trial by jury under Federal Rule of Civil Procedure 38(b) on all issues so triable.

Dated: June 11, 2026

Respectfully submitted,

DAVID TURNER

By: /s/ Tara Thompson
One of Plaintiff's attorneys

Jon Loevy*
Clara Presler*
Russell Ainsworth*
LOEVY & LOEVY
311 N. Aberdeen, Third Floor
Chicago, IL 60607
Voice: 312-243-5900

* *pro hac* applications forthcoming

26